and 115721 Hill v. United States. Mr. Eberhardt. Mr. Chief Justice, may it please the Court, the judges of the Seventh Circuit are unanimous in their belief that this case raises a good question. And, of course, that good question is, why would Congress want district courts to continue  unfair and racially discriminatory? My colleague sitting on the other side of the podium, I submit to the Court, does not answer that question. Petitioners feel that the answer to that question can be found in the text of the Fair Sentencing Act. And while we admit that there is no express answer, the text gives us the required fair implication. The text in Section 8, the text in Section 10. Scalia, is it fair implication enough? You're talking here about a repealer, essentially, of an earlier provision, Section 109. And our cases uniformly say that it has to be clear implication, unquestionable implication. Do you think this is really clear and unquestionable? No, it is not. But the standard from this Court, Justice Scalia, is fair implication. And it has been ever since the Great Northern case. The standards began, or I'm sorry, as a necessary implication in Great Northern, moved to plain and clear implication in Hertz and Woodman, and then Marrero, which is relied on heavily by Amicus. Of course, the statute itself says express, right? We're talking about Section 109? That is correct.  But again, ever since 1908, that's a standard that this Court has not accepted. And this is based on the provision, the well-settled provision, that an earlier Congress cannot bind a later Congress. Oh, and I understand that. But presumably, we also have the proposition that Congress, when it enacts legislation, knows the law. They would have known Section 109 required an express statement if they wanted to apply the change retroactively. So why shouldn't we hold them to that standard? The answer is, no, I don't believe that Congress felt that that was the standard. Again, relying on this Court's jurisprudence that said, you give us text, and if we are able to find that the fair implication and the intent of Congress through that fair implication is that this new statute applies, because an earlier Congress cannot bind the newer Congress. Well, on your statement that the one Congress cannot bind a later Congress, do you mean we're not supposed to look at 109? We're not supposed to look at the Dictionary Act? Oh, absolutely the Court is, Your Honor. And we acknowledge that. So then the fact that 109 is on the books is relevant. And it's not a question of one Congress binding the other. It's a question of what the second Congress did. Yes, 109 is relevant, but it's the standard to be employed in determining whether or not there's a fair implication of what the later Congress meant. Scalia, how many cases do you have that say fair implication as opposed to quite a few that say clear and unquestionable implication? Marrero, is that the one case you rely on? Fair implication from Marrero. A footnote in Marrero, right? Correct. Anything else? Marcello. Marcello? What's the cite for that? I mean, there are a lot of earlier cases that make it clear when you're repealing a prior statute, if it isn't expressed, it has to be at least a clear implication. And I'm astounded to think that in a footnote we're suddenly going to change that to simply fair implication. Why? Yes, Your Honor, you're correct. It's clear or unnecessary, but Petitioners contend that not only do we meet the fair implication standard. Well, that's a different question, and we can talk about that. But how did Marrero come out? Did it find an overruling or not? Marrero primarily was based on the fact that there was a specific provision for non-retroactivity. And in an alternate holding, the Court held that 109 would also be relevant to the decision. Marrero, though, was a haven. So it did not find 109 overcome by fair implication, right? Correct. So it's entirely dictum, right? And dictum in a footnote. No. I believe it is an alternative holding because the primary holding in the other way, the holding was that 109 governed, no? I'm sorry. I thought you said the holding was that section 109 governed, that it had not been repealed. 109 was the alternative holding, saying that 109 would also preclude the retroactivity provision. Exactly. And therefore, whatever it said about what is necessary for repeal of 109 was purely dictum, because it held that 109 was not repealed. So even if fair implication was the test, it was not the test applied and determinative in the case. So it's dictum, and dictum in a footnote. I don't agree, Your Honor. But that's true of all of the cases that use the cases you pointed to, two or three that use fair implication. The Court in all those cases found that there was no fair implication, so that 109 governed, didn't that so? That was true in Marrero, it was true in Northern Securities? In Marrero, the primary holding was based on the fact that there was a specific provision for non-retroactivity. But in none of the cases that use the fair implication language did the Court say. And therefore, the old statute no longer governs. Correct. So you're relying on a standard that this Court did, must have considered appropriate because it deviated from the words of the statute, said it a few times, but in application, it always came out the same way. Well, in application, when the Court applied this in Marcello, when they were weighing the language of the Administrative Procedure Act as opposed to the language of the Immigration and Nationality Act, I think the Court made clear, as it went through the statute there, that there was a fair implication. And then once you get to the point of fair implication, that necessarily means that there is some kind of an ambiguity. And then the Court followed up saying that we then did look to the legislative history, and the legislative history backs up the implication that we did find. But that was not true of the 109 cases. You don't have a 109 case that said the standard is fair implication, and therefore, the old statute is not enforced. Directly, I don't believe so. Do you think that if we stick to the language of the statute, if we are, indeed, looking for an express provision, do you agree that there isn't any here? We agree that there is no express provision, but obviously, we also contend that, going back to the proposition that the earlier Congress cannot bind the later, that that standard has been rejected, even though argued by my colleague to my left, that is no longer the standard ever since. Well, I'm not sure he's arguing that. I think he acknowledges, as our opinions say, that it can be done by implication, but it has to be clear and unmistakable implication. I think that's the position he's taking. Anyway, you want to tell me why this is clear and unmistakable? When you look at the language of Section 8, when Congress has mandated the Sentencing Commission to use their emergency authority to achieve consistency with other guideline provisions and applicable law, it makes clear that Congress meant this needs to take effect as soon as possible. Congress even said, as soon as practicable and no later than 90 days. This would be meaningless, actually, with regard to the individuals who are in this pipeline to be sentenced, because there would be so few individuals who would be arrested, charged, convicted, and sentenced within that 90-day period that Congress could only do that. Well, there might be few, but there — but assume that you're drafting this legislation and you want it to apply only to defendants who commit an offense after the enactment of the Fair Sentencing Act. But you also want to do everything that you reasonably can to make sure that when the very first one of those defendants comes up for sentencing, there will be new sentencing guidelines in effect that are geared to the new lower mandatory minimums rather than the old sentencing guidelines in effect. Would you not provide that the — would you not require the Sentencing Commission to act as quickly as possible to get the new sentencing guidelines out? No. No? You would say take your time, and it doesn't matter if a few defendants who are — who commit the offense after the enactment of the Fair Sentencing Act come up and they are subjected to the old, soon-to-be-obsolete sentencing guidelines? No. I think it's clear that the average time from charging to sentencing is going to be at least 11 months. In the case where a defendant goes to trial, it's going to be much more than that. So there really need be no rush on the part of Congress to condense this down into 90 days. They could go through their usual 120-day — or 180-day procedure, submit these to Congress, wait for approval or disapproval, and things like that. Are we just supposed to assume that Congress knows that? I mean, if you'd ask me how long is the usual time from conviction or, I mean, arrest to conviction, I wouldn't know if it's closer to 90 days or 11 months. I think we do, Mr. Chief Justice, that we have to know that Congress assumes — or that Congress knows that because these are the individuals who drafted the Sentencing Reform Act. Well, right. But, I mean, and we assume Congress knows the law. I don't know that we can readily assume they know details such as that and evaluate their — what would your position be if the Congress said, do this as soon as practical, but in any event no later than 8 months from now? Would we then think there's a fair implication that Congress meant it to apply retroactively or not? On just the point of the immediacy placed on by Congress, I think that would take away from the fair implication that Congress meant that the law should go — that the law should be effective on the date of the President's signature. But why do you pick the date that the Fair Sentencing Act went into effect if the — if the guidelines, the 90-day period that the Commission came out with its new guidelines on November 1st and sometime after August 3rd, which is when the Sentencing Act — so on your theory, why isn't the right date the date that the sentencing guidelines went into effect? The correct date is the August 3rd date, Your Honor, because of the intent of Congress made known through the implication of the language taken in the legal context of the Sentencing Reform Act. When Congress meant to correct their error, I believe they made it perfectly clear that they meant to correct this error as soon as possible. This has been an error that had been discussed for 25 years and was finally trying to be corrected. Mr. Chief Justice, if I might, reserve the rest of my time. Roberts. Thank you, counsel. Thank you. Mr. Dreeben. Mr. Chief Justice, and may it please the Court. The Fair Sentencing Act manifests the requisite fair and necessary implication that Congress intended that its new mandatory minimum thresholds apply in all sentencings after the date of the Act. Do you think it's a clear and unmistakable implication? If we're going to argue about the language. I do, Justice Sotomayor, although this Court has not used the words clear and unmistakable to describe what it takes to overcome the presumption by Section 109. Well, generally the word express incorporates clear. There's no dispute here. I don't think that there's a lack of an express statement in the Act. So why doesn't that defeat your case? Well, as Justice Scalia explained in his concurring opinion in Lockhart v. United States, one Congress cannot impose standards of how another Congress is to enact legislation. The subsequent Congress is free to choose how it will express its will in the language or structure that it sees fit. And I'd like to give an example. Well, so then we ignore the dictionary? No, of course not, Justice Kennedy. And we ignore 109? No. It provides a background presumption that overcomes the common law rule of abatement under which, if Congress had amended a statute, all prosecutions under the prior statute would be deemed to be a nullity and they would not be. Well, why doesn't that bring us right back to what 109 says? This Court has made clear in not only the Section 109 cases, but I think, as my colleague mentioned in Marcello v. Bond, that there are no magical passwords that Congress has to use to explain itself. And let me give an example, because I think that it will help to put in focus why I think the Fair Sentencing Act does contain the requisite implication. If Congress had written in the Fair Sentencing Act, henceforth, after the date of this Act, probation officers shall prepare pre-sentence reports and submit them to courts in which they shall calculate the mandatory minimum penalties under the standards announced in this Act. I think this Court would draw the structural inference that it did not intend that probation officers prepare that information for nothing. They intended that it be prepared so that sentencing courts would use those new mandatory minimums. Exactly. And I think we would come out that way. I think you're entirely right. But the accelerated the direction to the Guidelines Commission to promulgate the Guidelines on an emergency basis is not, as you just put it, for nothing. As Justice Alito was suggesting, it has some effect. I don't disagree with that. It's not comparable to what you've just said. Well, I think it is, because there's a piece of that section that I'd like to draw the Court's attention to, because I think that it critically explains what the Sentencing Commission was supposed to do. Section 8 is all over the briefs, but I have it in the government's gray brief at page 10a. This is the section that directs the Sentencing Commission to promulgate new guidelines and to exercise its emergency authority, and I'm going to quote here, to make such conforming amendments to the Federal sentencing guidelines as the commission deems necessary to achieve consistency with other guidelines provision. And here's the critical phrase, applicable law. That phrase, applicable law, can only mean sections 2 and 3 of the Fair Sentencing Act, which are the provisions that increase the thresholds of quantities necessary to trigger the mandatory minimum sentences. That's fine, but they apply that applicable law to those, as you say, admittedly few people who have been prosecuted, convicted, and are now being sentenced under that applicable law. There may not be many of them, but it does not – it does not deprive that language of all meaning. Well, Justice Scalia, I want to put this in the structural context of the Sentencing Reform Act. The Sentencing Reform Act directs courts to apply the version of the sentencing guidelines that is in effect on the day of sentencing. It's not a time of offense rule. It's a time of sentencing rule. And there – that means that everybody who comes before the sentencing court after the date of the Fair Sentencing Act, when the new guidelines are in place, will have those guidelines applied to those defendants. Those guidelines are supposed to be conformed to applicable law. The only applicable law that there could be is the new mandatory minimum sentence. Well, no, you're begging the question. The law applicable to pre-statute offenses continues to be the prior law. And the applicable law to offenses that have occurred after the enactment date is the same. But that would mean, Justice Scalia, that the guidelines would not be conformed to applicable law for the defendants who were sentenced after the FSA. They would be conformed to inapplicable law. And Congress knew when it set up Section 3553A that the guidelines that would be applied are the ones that are enforced at the time of sentencing. Roberts. So why 90 days? I mean, the commission basically just took the ratio under the new act and applied it, didn't they, throughout? It took the mandatory minimum formula that had been changed and changed it throughout the sentencing provision? Well, it was a little bit more complex than that, because what the FSA did was two things. It lowered the mandatory minimums by increasing the crack thresholds, and it targeted role in the offense of the defendant for increased sentencing and mitigating factors for decreased sentencing. And the commission had to translate that into new guidelines. It acted quickly. It was told to act as soon as practicable. It was entirely possible under the statute, and probably would have been desired by Congress, that new guidelines would have gone into effect on August 4th. At that point, the only people in front of the sentencing court would have been pre-FSA offenders. But how many are we talking about, say, a 3-month period? How many people commit? Most people, everybody pleads guilty. They're caught quickly. Not necessarily. I know not necessarily. That's why I want your estimate of how many we're talking about. Well, roughly speaking, there have historically been about 5,000 crack offenders a year. So that means that, come on. Now, how long historically, roughly, if you know, does it take from the time the person is caught till the time he's sentenced, when he pleads guilty? We put in the brief the figures from the administrative office of the U.S. courts, which indicate that the median figure is around 11 months. But that's the case. Breyer. 11 months. Yes. But over how many of the ---- you see what I'm trying to get at. I'm trying to get at a guess, if you like, of how many people we're talking about. The two numbers that I can't find in the briefs are roughly, if your opponent is correct, and it only applies to new people, this thing, that's the applicable law.  You're assuming the answer. I haven't heard an argument for it, except that there are very few people that his interpretation or the opposite interpretation would catch. And how many are there? About. I mean, is it more like 10 or is it more like 50? Is it more like 100? Can you make a guess at all? All right. I think that there will probably be thousands of crack defendants who will be sentenced under the old mandatory minimums that Congress repealed because they were perceived as being racially disparate and unfair. It isn't obviously what I'm trying to get at. You see what I'm trying to get at. I guess the answer is yes. I don't think that Congress balanced numerically. No. No. But you're saying it would be absurd to think that this Section 8 has to do only with prior ---- the pre-enactment offenses. Absurd. All right? If there's just likely to be one person, I tend to buy your absurdity argument. If there's likely to be 500 or 1,000, I'm much less certain. I'm not making an absurdity argument, Justice Breyer. The argument that I'm making is that when Congress directed the Commission to conform the guidelines to applicable law, the only applicable law that it could have had in mind ---- No. That argument, of course, they could have had both in mind. They could have had applicable law for the new people is our new statute. Applicable law for the old people, you don't need any amendment. We're not talking about that. Just apply the old law. That makes perfect sense. But the Sentencing Reform Act ---- it doesn't make perfect sense because the Sentencing Reform Act is set up to apply new guidelines to people based on date of sentencing. New guidelines to what people? That's the issue. Everybody. If it's only new ---- you're making the question again. If it's only to people who've committed their offenses after that Act, then you have one set of applicable guidelines for those people, and you leave in effect for people who committed their offense before the enactment date, the prior guidelines. I don't think there's anything necessarily implied by this provision to the effect that there is only in the future one set of guidelines applied, you know, one guideline fits all. I don't think that's the ---- Let me refer to the statute, because the statute answers this question differently than the way Your Honor has assumed it works, okay? On page 30A of our appendix. We reproduce section 3553A, and 3553A4 establishes that when a ---- 30A? 30A. I'm sorry, 39A. 39A. Sorry about that. The Sentencing Reform Act provides that the applicable set of guidelines that will be applied are those that are in effect on the date that the defendant is sentenced. This is 3553A4A2. And that provision has been in the Sentencing Reform Act since the time the Sentencing Reform Act was enacted, and Congress explained for those who read legislative history that it wanted, and I'm going to quote here from the legislative history, the guidelines and policy statements to be applied are those in effect at the time of sentencing. Congress's reason for that was it wanted the most sophisticated statements available that will most appropriately carry out the purposes of sentencing, and to impose a sentence under outmoded guidelines will foster irrationality in sentencing and would be contrary to the goal of consistency in sentencing. Scalia. What is section 3742G, which is exactly that? That provides that if a case is reversed on appeal and sent back for resentencing the original set of guidelines that were applied at the date of the initial sentencing shall be used. It's an exception to the general rule. Alito, could I ask you this about your argument? Because I do think the one you're stressing now is a good argument and your best one. But what troubles me is that an earlier bill, H.R. 265, which contained a provision that says there shall be no retroactive application of any portion of this Act, contains the very language that you're stressing now. So how do you reconcile that? Well, first of all, Justice Alito, what that bill would have done is postponed the effective date for 180 days so that there could be synchronicity between the guidelines and the new mandatory minimums. The retroactivity that it was concerned about would have reopened final sentences. There's no question here about reopening final sentences. So that bill was explicit. We don't want to reopen final sentences. The government is not asking for reopening of final sentences. Now, I understand that. But wouldn't you want to – the problem that you're – I understand your argument to be that the language you're stressing now will mean, if this applies only to post-enactment offenders, that there will be defendants who will be sentenced to under the old mandatory minimums but the new guidelines. Correct. Would that not occur under – clearly occur under H.R. 265? No, I don't think so, because that bill was designed to postpone the effective date for 180 days. I think everyone in Congress understood that these guidelines had undermined the credibility of the criminal justice system for years. The Sentencing Commission had four times submitted reports to Congress that bemoaned the fact that they were not only inconsistent with the purpose of the sentence. I mean, yes, that's very nice, but let's talk about text, not what about the emotions of Congress. This section that you quoted, A, well, what, 4A, 2, section 3553A, is that in the new statute? No. That's part of the Sentencing Reform Act from the beginning of the guidelines. It was – It was, in effect, it was not the amendment. Congress didn't insert that when it made this amendment. You're just saying that that is the incidental effect of the provision that Congress did adopt. No. I'm saying that the background principle that our legislators are familiar with the law surely applies to sentencing law. And Congress understood that once the new guidelines were in effect, which it wanted to happen as soon as practicable, they would be applied to all defendants in the system based on time of sentencing, not time of offense. And it wanted those guidelines to be conformed to applicable law. And it is very strange to say that it wanted new guidelines, in effect, to be conformed to inapplicable law, such that there would be the incongruous result that the new guidelines that finally fixed this egregious problem in the criminal justice system would be irrelevant for many defendants because they would still be living under the hundred-to-one racially disparate impact effect of the guidelines. Sotomayor, Mr. Dreeben, almost any law that repeals a prior penalty is doing so because the legislature determines that that prior penalty is unjust in some way, because why do you eliminate a penalty unless you think it's necessary to do so and that it's unjust or unjust in some way? So what makes this repeal particularly different, so that the exception doesn't swallow the rule because you can argue in almost any situation that the repeal is of something that's unjust? Dreeben, Mr. Chief Justice, may I answer the question? Justice Sotomayor, what's unique about this context is that there's a confluence between the way that the guidelines treated crack and the way that the statutes treated crack. And for years, the Sentencing Commission had said, we can't fix this problem with the guidelines alone. We need the help of Congress to alter the mandatory minimums. And once you do that, give us emergency authority so that we can put new guidelines into place that will work hand in glove with the new mandatory minimums, as the Chief Justice explained, so that all defendants who come before the Court will not be subject to the discredited crack policy that Congress had repealed. Thank you, counsel. Mr. Estrada. Thank you, Mr. Chief Justice, and may it please the Court. I think this is a difficult case for public policy, but it's not a difficult case for legal doctrine. Fairness is on both sides. Justice Sotomayor, what's so difficult for a legal doctrine to say that when Congress has made a finding that a law has a discriminatory impact, because I always thought that when discrimination was at issue, that we should do as speedy a remedy as we could, because it is one of the most fundamental tenets of our Constitution, as has been repeatedly emphasized in case after case, that our laws should be enforced in a race neutral way. Once Congress has said, this law is not being enforced in a race neutral way, we want to fix it, why shouldn't our presumption be that the fix is immediate rather than delayed? Because I think it would be wrong to assume that the passage of the Act reflects Congress's confession of intentional discrimination. I think it does recognize that there were members of Congress that had concerns about the disparate impact of the law. Mr. Estrada, I've been a judge for nearly 20 years, and I don't know that there's one law that has created more controversy or more discussion about its racial impact than this one. Absolutely. I don't think there is any other law that had as much conversation about its racial implications than this one. Justice Sotomayor, that is absolutely right. But it is very significant that for 20 years we had this argument. The Sentencing Commission, as the government points out, went to Congress again and again and again to say, we don't agree with this, this makes no sense. And for 20 years, Congress could not bring itself to change it because there was no agreement on the part of the lawmakers that the public policy was that easy. And the fact is you have a whole assortment of bills that were considered by Congress in the last several sessions for people who believe legislative history is significant. They're all very instructive. Most of them did a variant of the same thing. Most of them have very identical language, even some of the language that's at issue here. They had different proposals. There was one for 24-1. Another one, there were many one-to-one. It was clear that Congress could not bring itself to an agreement as to what the right answer was. Kagan. Well, Mr. Emanuel, I mean, that's true that it took Congress a long time to decide to do this. I think the question is, once having decided to do this, what did it decide to do? And whether it would make sense, once having decided to do this, to have the guidelines be the new guidelines, but the mandatory minimums be the old mandatory minimums. And what everybody understood was that if that were the case, if the new guidelines and the old mandatory minimums sort of both applied together, it would lead to ridiculous disparities in the way people were sentenced. And so the question is, once having decided to do this, can't we assume that Congress decided to do it? No. Let me give three answers to that. I think, you know, one of the fundamental points here is that a premise of the law is to treat like people alike. And people who committed the same offense on the same date and may have done so with each other, we would expect to get comparable punishment if they are comparably situated as for criminal history. And the solution that's being urged undermines that, even though that is exactly what Section 109 says. Ginsburg. But you have to draw a line someplace, and that's inevitable, that some people are going to fall on one side. But the point about the guidelines and statute working together, wasn't there a time when the sentencing guidelines, they wanted to do away with this distinction and Congress said, no sentencing commission, you can't do it, you can't do it to the statute? There are two points about the guidelines that I think we have to keep in mind, Justice Ginsburg. The first one is that they are guidelines, especially in the world after Booker, which is the world that confronted Congress in 2010. They are guides that must be considered by the judge to inform judicial discretion. So in the nature of the guidelines, there is nothing inherent in saying that we must have new ones that also implies a new application of statutory law to people whose offense conduct occurred earlier. The second aspect of it is that it has been part of the nature of a guideline system for two decades, that it has been consistent with a decision by Congress in some areas to constrain the exercise of discretion with mandatory minimums. And this Court has recognized that in multiple occasions, in Kimbrough, in Neal, in DePierre, any number of cases, and the guidelines themselves in Section 5G1 recognize that the mandatory minimum may trump a lower guideline. So when you have a long history in 2010 of rulings from this Court acknowledging, as you said in your opinion in Kimbrough, that this may lead to cliffs, et cetera, and you also have a recognition by the commission itself that they have to integrate this reality of sentencing law into their own guidelines, there is very little basis for an inference that Congress, in providing new guidelines, would have contemplated that the effective date of the law would change. But Congress did say, Sentencing Commission, you conform your new guidelines to applicable law. The applicable law has got to be the new law, because if it were the old law, there's nothing to conform, there's nothing that they need to change. It's only that this Section 8-2 makes sense only if the applicable law is the new law. Otherwise, the commission doesn't have to do anything to achieve consistency. Mr. Ginsburg, I am prepared to admit, for purposes of this case, and I think it's probably the right answer that Congress intended, that the guidelines had to line up with the penalties of the FSA. The question is cui bono? For whose benefit? And Congress clearly contemplated, for some of the reasons that you outlined, that the system and the change in the statute would not do any good for people coming to be sentenced six months later if they still had higher guidelines. But much has been said here today about the 90-day window. The 90-day window is irrelevant. The really relevant window is the comparison of what the new guidelines would have been and when they would have come out, absent the emergency authority. Absent any emergency authority, new guidelines would have come out November 1, 2011, which would have been a good 15 months after the passage of the FSA, and even on government accounting. Mr. Estrada, even without the guideline amendment, for those defendants who committed crimes after the effective date of this Act, they would not have had new offense, not old offense. If the day after this Act they committed the offense, they wouldn't have had a mandatory minimum that required their imprisonment for a certain amount of time, because the Act had already done away with the mandatory minimum, correct? Or changed it, I guess. Changed it, lowered the amount. Some of them may drop from 10 to 5, for example. Exactly. So those people would not have been bound to a mandatory minimum. And since district courts were not bound to the guidelines anyway, even if there had been no amendment to the guideline, the judges would have known they weren't bound to the mandatory minimum and probably not bound to guidelines that hadn't been amended yet either. That's correct. So it would have benefited these defendants no matter what. That's correct on both counts, but that's, but that I, you know, it sort of assumes that the guidelines are systemically irrelevant in all cases, because after an, after an analysis. No, only in cases like this where we know they have to change because Congress has directed they be changed. But look, I mean, one of the interesting aspects about these cases is that one of the people got the benefit of being sentenced at the time that the post-FSA guidelines, the new emergency guidelines, provided sentencing range for him of 110 to 137. That's, that's Mr. Hill. These are the new guidelines. He was sentenced to a mandatory minimum of 10, which is on a, on the lower end of that guideline. The only reason that case is in the U.S. Supreme Court is because even after the new statute, the judge was of a mind that he wanted to use the one-to-one ratio. And that's why there's a controversy here. But that highlights, you know, the point that I'm trying to make and that the Court made in Kimbrough, which is that the mandatory minimums tend to enforce a species of uniformity in a world in which the guidelines are advisory. And it do help uphold, you know, the principle that people that committed comparable offenses will have some rough comparability. Sotomayor But that begs the question I started with, with you, which is if we know that this new Congress has already determined that those, that mandatory minimum is discriminatory in the way that it had been constructed, what would be the purpose of delaying implementation? If Congress had made that finding, Justice Sotomayor, I would fully expect them as a citizen to cut the sentences of everybody who's already serving the sentence irrespective of finality. And the fact that Congress did not do that, which is a proposition on which everybody agrees, I think is powerful evidence that the assumption that this necessarily reflects a conclusion that the previous system was indisputably discriminatory as opposed to arguably. Scalia I would find that extraordinary, that they say it's racist, but we're going to leave in effect all of the sentences that have previously been imposed. That seems to me very unlikely. Mr. Estrada, I would like you to explain the effect of 353A-4, big A, little 2, which does seem to require, to be sure, it's not in the new legislation, but it's the background against which the new legislation was adopted, and it seems to require that the Court use the guidelines in effect at the time of sentencing. Right. This is a fight about competing background rules. Section 109 is one of them, and it says the old law shall be applied to people who committed their offenses while the old law was in force. It is a directly applicable statute to the situation at hand. This purported competing background rule is a rule that simply says a judge shall consider the guidelines, then extant. And this is part of the advice that he gets. It implies nothing about the duty to apply it. Suppose you're wrong about that. I'm sorry. Suppose you're wrong about that. I mean, I think when they meant do it, that consider, does that change? I think it would be a radical understanding. No. I mean, I think that when they wrote 3553, they were thinking those are the guidelines that are going to apply, do it. Now, I'll look into that. But if I reach the conclusion, I agree, it's competing background rules. I agree applicable law doesn't help us, because all the time there are two different sets of guidelines that apply depending upon when you committed the crime. That's very common. All right. So I agree with you that far. But now I'm worried about the last question Justice Scalia asked does, I think, focus this question, because we have not only 109, we have also the 35, the one we're talking about now, and that says normally you will apply the guidelines in effect even to people who committed the crime before the new statute. And now, do we have any analogies? Has this ever happened before? Is there — I can't find out how many people we're talking about. I'd like to know, at least, are there many other occasions when Congress amended mandatory minimums so there's some precedent? Any? Prior, this is a staple of what has happened in the lower courts in a routine application of Section 109. My best example, and please do not think I'm pandering, is a case called U.S. v. Smith from the Second Circuit, which was authored by then-Judge Sotomayor. And it was a comparable case in which Congress had dropped the severity of a penalty. It had to be, you know, the penalty that deals with supervised release. And Congress had gone from a world in which a violation of supervised release had to be subject to a mandatory sentence to a world in which the statute had been changed to say that it was up in the discretion of the judge. By the time the offender came to court, he had violated his supervised release. And his argument, which is actually a lot more plausible than this one, was that before he violated, the law had changed and he was now, in effect, now coming to the court for a new sentencing, which is exactly analogous to this. The Second Circuit had no trouble in saying that a routine application of Section 109 killed that claim because the offense was considered completed at the time it was committed. And therefore, this was a claim that simply was not tenable in light of the language of Section 109. And that, too, is a case where somebody could have said the law that now applies is the one that applies to my new sentencing under the new applicable guidelines. Now, I will say another two logical points about, you know, the competing rule that the government is urging. Kagan. Mr. Estrada, before you do, if I can understand your argument as it relates to Justice Scalia's questions, I just want to make sure I understand it. There's a person who has 4.99 grams of crack cocaine. And you do not dispute, do you, that that person would be subject to the new guidelines, which are based on the 18-to-1 ratio rather than the 100-to-1 ratio? I do not. Okay. So you do not dispute that. So then we're living in a world in which the person who has 4.99 grams of cocaine is getting the 18-to-1 ratio, and a person who has 5 grams is getting the 100-to-1 ratio that's embedded in the mandatory minimums. That is absolutely right. And that was the paradox, if you want to call it that, that the government brought you in Kimbrough. And the Court accepted that that was the case. It said, yes, this leads to cliffs. It leads to a lack of a straight line in between all of the possible penalties. We accept all of that. It is an artifact of the fact that Congress at certain points, but not on a continuous line, has chosen to constrain sentencing discretion with the rough tool of a quantity threshold. It is all set out in the Kimbrough case. Now, when Judge Easterbrook talked about this anomaly, and he, of course, adopted the position that you adopted, but he just said, look, there is no earthly reason for this. It's just that we can't find a clear enough statement in the statute. I guess the question I would ask you is, can you do better than Judge Easterbrook? Can you find an earthly reason for why Congress would have wanted to create this weird halfway system in which if you have 4.5 grams of cocaine, one rule applies, but if you have 5 grams, another rule applies? I don't think that that's what he found inexplicable. I think the whole notion of changing it up to a point was more what he's saying. I can think that Congress has at least the rational reason that the Court ascribed to the system in its post-Booker way at the top of page 108, I think, in the Kimbrough case, where it is that now that we have a system in which so much depends on the discretion of the individual sentencer, it is actually salutary to have a few points of confluence that work as an enforced, although rough, uniformity in the sentences of comparably-situated offenders. If I go back to the case of the Court of Appeals, I think that's what he's saying. Kennedy, but the government is arguing and the Petitioner is arguing for a uniform rule, the rule that the time of sentencing controls. Right. So the uniformity doesn't quite answer, unless I misunderstood. No. I think that they are competing visions of fairness and of uniformity in this case, Justice Kennedy. I am trying to hold, you know, the government to the one they had in the McNeil case last year, because the identical argument was made to them in the — on the other side, that it was somewhat irrational to apply the better sentence to the person one day later versus the person one day earlier. But Justice Kagan's question concerning what interest is served by your position has particular force when we are talking about the sentencing judge. The hardest thing, as we know, in the judicial system, one of the hardest things is sentencing. And you are saying that a sentencing judge who knows the law has been changed, who knows the law has been criticized, is nevertheless bound to determine that it's unfair for this person to be sentenced to the longer term. That's a very difficult position to put the judge in. Now, I — I'm sorry, Justice Kennedy. Go ahead. If I could take, you know, the other side of that argument, one of the reasons why I think, you know, the Court should accept that Congress contemplated new guidelines but not necessarily take up, you know, the government's view that this is actually  as a world in which Congress has now intervened and, in effect, compelled a lack — a more linear function of sentencing, so that henceforth, I guess the commission has to conform to the one — to the 18 to 1 ratio, and it would no longer be open to the commission, for example, to do what it did in 2007, which is we change our mind, there is a mandatory minimum that constrains us, but in light of the most recent scholarship, we think the ratio should be 16 to 1. And one of the reasons why I am reluctant to urge you to accept, you know, the government's construction, which I can see how they will be helped by in future cases, is that I think it's very implausible for Congress to have considered this, as they say, the centerpiece of the statute and have it be the last dependent clause of Section 8.  Breyer. Breyer. Wait, wait, wait. This is — just tell me if maybe the light is dawning, and maybe I'm just at the same question Justice Kagan asked. Think of before the statute. There were two sets of people, those people subject to the mandatory minimum, and those crack people who — the mandatory minimum didn't matter, but the commission wrote amendments consistent with. So they were tough amendments, so the law didn't require it to produce consistency. Now the statute's passed. Now we have some of the pre-Act offenders. Because of the two sets of things, section 8 on the one hand and the 353G on the other, in respect to those people who were not governed by the mandatory minimum previously but were subject to the then-conforming amendments, now we'll have to be subject to new conforming amendments that conform to the new thing. And that will have to be because of the combination of the two sections that Mr. Drebin read, the R. Now, if that's so, we get to the cliffs that Justice Kagan is talking about. And if I'm right so far, we're now back at the probation officer example, and it's so odd and so peculiar that it is not just a fair — do you see where I'm going Is that too complicated? No. No. I don't blame you, frankly, but let me say two things. I don't blame you. I don't blame you. The simple point I was trying to make, Justice Breyer, is that the whole thing, that the guideline system now has to conform with applicable law, which the government reads as the new ratio and could extend to other things, could potentially disable the Commission from adopting its own ameliorating amendments that depart from the regime of the mandatory minimums. And so whereas there are mandatory minima that are troublesome and give rise to cliffs, there are also occasions in which the Commission is able to do things that are not consistent with the statute. Let me give one example that was mentioned by the Court in De Pierre. As the statute was interpreted in De Pierre, cocaine-based is cocaine-based. It gets you a mandatory minimum if it's chemically based. The Commission thinks that you only get the enhanced penalties if the cocaine-based happens to be crack. Similarly, under the Neal case, you get to weigh the carrier medium for the LSD, but, you know, the Commission thinks that you give it a presumed weight that is probably lower than the actual medium. In both of those cases, the Commission comes up with guidelines that are lower than the methodology that is contemplated under the statutory analysis. Were you to adopt the applicable law and the assumption that the Congress has now dictated that these things have to line up and never to have cliffs again because they are bad, you could end up having untoward consequences as to what it is that the Commission can do in the future in order to deal with other ethnicality. Sotomayor, I'm sure I follow your explanation. I'm sorry. Go ahead, Justice Sotomayor. I'm not sure I follow your example. I think that the guideline regulation is that the sentencing commission always has to be passed guidelines consistent with the mandatory minimum. And if the statute says that the mandatory minimum requires the carrying medium to be included, the guidelines can't change that. The mandatory minimum would apply. For purposes of the mandatory minimum, but not for the sentences in between. But, Defendant, I don't know that I know of one guideline scheme that changes whatever Congress has statutorily required. I just gave you two examples. The LSD guideline that was at issue in Neal and the crack guideline that was not at issue, but was discussed in connection with the statutory interpretation in DePierre. You know, my point, I don't want to overstate the point, my point is there is reason to believe that Congress intended the new guidelines to be available for new offenses. The fact that Congress gave emergency authority so that that would be possible makes perfect sense, because in the absence of emergency authority, the new guidelines cannot apply. Sotomayor, what you're arguing is not that the guidelines would be available for new offenses. What you're arguing is that they would be available for everybody except the cliffhangers. That's what you're arguing. Everyone but the cliffhangers, because as Justice Breyer pointed out, those people who were subject to the old guideline at a higher rate, above the minimum, now have the benefit of a lower rate, and so they're going to get sentenced to a lower amount, because they're not bound by the mandatory minimum. There are two alternative worlds after the FSA, Justice Sotomayor. In the first one, guidelines don't change for 15 months. People who committed the crime after the FSA come to the court for sentencing 10 months later, and they get the new mandatory minimum, but it doesn't matter because the old guidelines are higher. It is possible that the judge would intervene and use his Booker discretion, but not necessarily so. In the alternative world, which Congress did give us, is you change the guidelines as soon as you can. If you come to the bar of the court with a pre-FSA offense, it doesn't matter, because the new guidelines, like every guidelines book since the beginning, say that if a mandatory minimum applies, that controls over the then current guidelines, which is one of the fundamental reasons why the alternative view of the world and the alternative rule of construction of the government profits makes no sense. As a pure statutory construction matter, and for those members of the Court who give way to legislative history, I will point out that the emergency authority section that the government thinks is dispositive in this point was in every version of this bill, Senate 1711, Senate 1383, you know, the House versions that they cite, even when those statutes, as Justice Scalia pointed out — I'm sorry, Justice Alito pointed out earlier — provided an effective date for the new statute of 6 months hence. Alito, along those lines, could I ask you this question, which is intended to explore the issue whether the argument about bringing the guidelines into consistency with applicable law doesn't assume the answer that is — that one attempts to get from it. Suppose the Fair Sentencing Act said expressly this applies only — the new mandatory minimums apply only to post-act offenders, but it also contained a provision that says the Sentencing Commission has to bring the guidelines into consistency with applicable law. I assume there what they would have to do would be to say that the new guidelines apply only to post-enactment offenders so that the Fair Sentencing Act would trump this previous provision in the Sentencing Reform Act. Wouldn't that be correct? And I think that that would be true here as well. And the reason why I was highlighting the earlier bills is because each and every one of them had the same, almost word-for-word, conform with applicable law, emergency authority. All of them uniformly said the new mandatory minimums will not apply for another 6 months after the enactment. As a logical proposition, if Congress thought that the identical language made sense to bring the guidelines into conformity with a law that would not take into — that would not kick in for another 6 months, having it kick in sooner does not have any more logical import in saying that, therefore, you know, the guidelines now mean that previous offenses get a different sentence. But can I understand what you're saying, Mr. Estrada, because if Justice Alito is right, then the new guidelines that the Sentencing Commission has, in fact, promulgated should not be being applied right now to those who committed crimes before the enactment date. And that's not what's happening now on the ground, is it? Estrada, Justice Kagan, it is not happening in that manner, because the guidelines — every book of the guidelines, I believe it's in 1987, which was the first one, has had like 5G11, which says these are the guidelines, but 5G tells you if a mandatory minimum applies, for whatever reason, you apply that and that becomes the mandatory sentence. And so there has never been any reason to have two sets of guidelines to account for CLIFs or mandatory minimums, because every guidelines book has had a built-in solution to that problem, which is we understand that there are CLIFs, we understand that there is a world of mandatory minimums, we can't fix those, this is our guideline sentence, if somehow, for some reason, because it occurred, you know, before or whatever, there is a mandatory minimum that applies, the guidelines say the mandatory minimum becomes the guideline sentence. So in that sense, a Congress that knew the law would understand that saying you have to have new guidelines had no logical force in saying that therefore the effective date of mandatory minimums or any other factor that bore on the application of mandatory minimums would be changed. Thank you, Mr. Estrada. Mr. Eberhard, you have three minutes. Thank you, Mr. Chief Justice. May it please the Court. Obviously, this Court recognizes the difficulty of those district court judges sitting and asking themselves, what do I do with this defendant as opposed to another defendant? And after listening to my colleague, Mr. Estrada, I still have to ask the Court to consider the question that the Court has been asking, what possible reason could Congress have to want a district court judge to have to sit back five years after the date of enactment of the Fair Sentencing Act and impose mandatory minimums that everyone agrees at this point are racially discriminatory? Of course, you could say that about any statute that runs afoul of Section 109. I mean, that's what Section 109 says. Even though we have decided that this old law is bad and the penalty should be lesser, even though we've decided, when we do that, you continue to apply the bad old penalty to people who committed the crime before the amendment. Isn't that what 109 says? It can be, but as Justice Sotomayor recognizes, there has never been a situation such as this basically in the history of criminal law and criminal law sentencing in our country. I'd imagine you'd find disagreement with that. You know, on the other side, you know if there, as a matter of fact, in the year that these took effect, think of the sentences that were not governed by mandatory for crack, not governed by the mandatory minimum. Did the Guidelines provide, let's call it a low sentence, disproportionately low? Congress ultimately felt that they did, yes. And did they change those nonmandatory part when they wrote new ones? The Guidelines changed in different respects with regard to different amounts. The new Guidelines. I'll look at it. I suggest the Court, and we admit that 109 has to be considered in the case, but I think to find what was really meant by Congress, after the Court looks to section 109, the Court does have to look to the 3553 sentence, or 3553 section, that makes it very plainly clear, ever since the Sentencing Reform Act, that the date of sentencing clearly is the important date, as opposed to the date of the commission of the crime. All those arguments have nothing to do with the provision about the sentencing commission is supposed to act quickly or any of that, right? Your argument is what rational reason could Congress have had to, given the urgency of the problem, the seriousness of this, why wouldn't they have wanted the provisions to apply as you urge they should? But it goes hand in hand with the mandate from the Sentencing Commission to put the new Guidelines in place as soon as practical, as well as provisions of section 10. Thank you very much. Thank you, Mr. Eberhardt. Mr. Estrada, at the invitation of the Court, you've briefed and argued this case as an amicus curiae in support of the judgment below. You've ably discharged that responsibility, for which the Court is grateful. The case is submitted.